FILED

2009 Mar-31  PM 03:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| MADISON COUNTY | ) | |
| COMMUNICATIONS DISTRICT, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-06-S-1786-NE |
| | ) | |
| BELLSOUTH | ) | |
| TELECOMMUNICATIONS, INC., | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

This action, originally filed in the Circuit Court of Madison County, Alabama, but subsequently removed to this court on the basis of the parties' diversity of citizenship and the amount in controversy, *see* 28 U.S.C. §§ 1332(a), 1441(a), concerns whether the defendant, BellSouth Telecommunications, Inc. ("BellSouth"), has properly assessed its Madison County, Alabama, service users the emergency telephone service charge mandated by the Alabama Emergency Telephone Services Act, Alabama Code § 11-98-1 *et seq.* (1975) ("the Act").

Plaintiff, the Madison County Communications District, seeks a declaratory judgment that the Act requires, and has required, BellSouth to collect and remit to it one emergency telephone service charge for each voice telephone line or pathway capable of local exchange service, subject to the statutory limitation of 100 charges

per person per location.  MCCD also alleges claims of breach of fiduciary duty, misrepresentation, suppression, negligence, wantonness, and breach of contract, and it seeks injunctive relief and an accounting of BellSouth's records.[1]  This action is before the court on cross motions for summary judgment.[2]

## I.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides, in part, that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Likewise, "summary judgment should be granted where the evidence is such that it 'would require a directed verdict for the moving party' [if the case proceeded to trial]."  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 251 (1986)

---

[1] *See* doc. nos. 1 (Notice of removal) and 18 (Amended complaint).

[2] *See* doc. nos. 23 (BellSouth's motion for summary judgment) and 24 (MCCD's motion for summary judgment).

(internal citations omitted).

In either situation, the relevant question is whether the admissible evidence on file "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.

> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case.  The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  *See also Anderson*, 477 U.S. at 251-52 (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

Because cross motions for summary judgment are presented, "[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." 10A Wright, Miller & Kane, *Federal Practice and Procedure:  Civil 3d* § 2720, at

335-36 (1998) (footnote omitted).  *See also*, *e.g.*, *Arnold v. United States Postal Service*, 649 F. Supp. 676, 678 (D. D.C. 1986).  Further, the court is required to "relate all material facts in genuine dispute in the light most favorable to the party resisting summary judgment."  *Serrano-Cruz v. DFI Puerto Rico*, *Inc.*, 109 F.3d 23, 24 (1st Cir. 1997) (citing *Sanchez v. Alvarado*, 101 F.3d 223, 225 n.1 (1st Cir. 1996)).

## II.  SUMMARY OF FACTS

The Madison County Communications District ("MCCD") is a 911 emergency communications district, created by the Madison County Board of Commissioners pursuant to the Alabama Emergency Telephone Services Act, Alabama Code § 11-98-1 *et seq.* (1975) ("the Act"),[3] enacted by the Alabama Legislature in 1984 in order "to shorten the time required for a citizen to request and receive emergency aid."  Ala. Code § 11-98-5(3) (1975) (2002 Supp.).  The Act provides that the governing body of a municipality or county may create a communications district to provide enhanced

---

[3] *See* doc. no. 25, Statement of Undisputed Facts, ¶ 1.  Section 11-98-2 of the Alabama Code provides:

> The creating authority may by ordinance or resolution, as may be appropriate, create within its respective jurisdiction communications districts composed of the territory lying wholly within the municipality or of any part or all of the territory lying wholly within the county.  The districts shall be political and legal subdivisions of the state, with power to sue and be sued in their corporate names and to incur debt and issue bonds.  The bonds shall be negotiable instruments and shall be solely the obligations of the district and not the State of Alabama.

Ala. Code § 11-98-2 (1975) (2002 Replacement Volume).

911 ("E911") service, which is defined in the Act as "a telephone exchange communications service whereby a public safety answering point (PSAP) designated by the customer may receive telephone calls dialed to the telephone number 911." Ala. Code § 11-98-1(3).  Consequently, MCCD exists to receive E911 calls from residents of Madison County, Alabama, and to direct those calls to the proper emergency response agency.[4]

The Act provides that communications districts, such as MCCD, are political and legal subdivisions of the State of Alabama, fully funded by an emergency telephone service charge ("E911 charge") assessed to telephone service users.[5]  *See* Ala. Code § 11-98-2.  Telephone "service suppliers"[6] have a duty under the Act to collect the E911 charge from service users, and then to remit it to the appropriate communications district on a monthly basis.  *See* Ala. Code § 11-98-5(c) and (e).  The Act requires that the E911 charge "shall be added to and may be stated separately in

---

[4] *Id.*

[5] *See* doc. no. 23, Statement of Undisputed Facts, ¶¶ 3-5.  Section 11-98-5(a)(1) provides:

> The board of commissioners of the district may, when so authorized by a vote of a majority of the persons voting within the district, in accordance with law, levy an emergency telephone service charge in an amount not to exceed five percent of the maximum tariff rate charged by any service supplier in the district . . . ."

Ala. Code § 11-98-5(a)(1) (1975)(2002 Supp.).

[6] The Act defines "Service supplier" as:  "Any person providing exchange telephone service to any service user throughout the county or municipality."  Ala. Code § 11-98-1(7).

the billing by the service supplier to the service user."  Ala. Code § 11-98-5(c).

Defendant BellSouth provides exchange telephone service[7] in Madison County, Alabama, and this action involves whether it collects and remits the E911 charge for its channelized services — Primary Rate Integrated Services Digital Network ("ISDN"), ISDN Business Service, Channelized Trucks, Centrex ISDN, Centrex IP, and MegaLink Channel Service — in accordance with the Act.[8]  The so-called "channelized services" were developed with technological advances that allow multiple voice and/or data channels (transmission pathways) to be placed on a single physical exchange line,[9] such as fiber optic cables or cooper wires.[10]  The exchange

---

[7] "Exchange service is a general term describing as a whole the facilities provided for local intercommunication . . . ."  See doc. no. 25, Exhibit Z (General exchange price list definition of terms).  The Alabama Public Service Commission defines the term "exchange" as "the entire telephone plan and facilities used in furnishing local telephone service to customers located in an exchange service area."  See doc. no. 25, Exhibit CC ("Telephone Rules of the Alabama Public Service Commission").

[8] See doc. no. 23, Statement of Undisputed Facts, ¶¶ 2, 4.  MCCD concedes that there appear to be no BellSouth service users in Madison County for Centrex IP, and that such service is only a part of this case with respect to its claims for declaratory and injunctive relief.  See doc. no. 33, at 24, n.32.  BellSouth's MegaLink Channel Service is also only a part of this case with respect to MCCD's claims for declaratory and injunctive relief.  See doc. no. 37, at 1 ("MCCD agrees that its claims for compensatory damages do not address MegaLink Channel Service.").

[9] The "Communications Standard Dictionary" defines the term "exchange line" as "a line that joins a user's (customer's, subscriber's) end-instrument in a closed user group, or a switch-board, to an exchange."  See doc. no. 25, at 326.  BellSouth's "General Exchange Price List" defines the term "exchange line" as "[a]ny line (circuit) directly or indirectly connecting an exchange station with a central office."  See doc. no. 25, Exhibit Z, at original page 8.1.

[10] See doc. no. 25, Exhibit S, at 14-15.

lines typically support "B-channels" and "D-channels."  B-channels can either provide local exchange voice service or be used as a digital bit stream for data.[11]  D-channels can only be used as digital bit streams for data.[12]  BellSouth began offering various channelized services to its Madison County service users in the mid-1990s, after enactment of the Act.

BellSouth has offered its service users Primary Rate ISDN service since November 4, 1996.[13]  This channelized service is very useful and cost-effective for entities that need multiple voice pathways to a local exchange, because it provides the service user with the capability of activating up to 23 B-channels and one D-channel on each physical exchange line.  Thus, Primary Rate ISDN service provides the capability of 23 simultaneous conversations for each physical exchange line.[14]

BellSouth's "General Exchange Price List" provides that "the required components for BellSouth Primary Rate ISDN are as follows:  BellSouth Primary Rate ISDN Access Line where applicable; Interoffice Channels where applicable; BellSouth Primary Rate ISDN Interface; BellSouth Primary Rate ISDN B-Channels;

---

[11] *Id*. and doc. no. 23, Exhibit 9, at 8.

[12] *See* doc. no. 25, Exhibit S, at 14-15.

[13] *Id*., Statement of Undisputed Facts, ¶ 9.

[14] *Id*., Statement of Undisputed Facts, ¶ 10.

BellSouth Primary Rate ISDN D-channels; Telephone Numbers; [and] Call Types."[15]

One Primary Rate ISDN Interface is required for each Primary Rate ISDN access line

because the interface "provides muliplexing to support up to 23 B-Channels . . . and

one D-Channel."[16]

Each of the B-channels that a service user activates for outward voice

transmission may be used to reach the appropriate communications district.[17]  A

BellSouth service user may also activate one or more telephone numbers for each of

its B-channels that are activated for voice transmission.[18] BellSouth assesses service

users a fee on each Primary Rate ISDN Access Line, Primary Rate ISDN Interface,

B-Channel, and "telephone number requested inward and 2-way."[19]

Each of BellSouth's channelized services at issue utilizes ISDN (Integrated

Services Digital Network) technology to support multiple voice paths over one

physical exchange line.  BellSouth's Channelized Trunks and MegaLink Channel

Service provide the service user the capability of activating up to 24 voice channels

---

[15] *See* doc. no. 23, Exhibit 9, at 1.

[16] *See* doc. no. 23, Exhibit 9, at 8 (definition of "BellSouth Primary Rate ISDN Interface").

[17] *See* doc. no. 25, Statement of Undisputed Facts, ¶ 11.

[18] *See* doc. no. 32, Exhibit 16 (Affidavit of Dwight Rice), ¶ 7.

[19] *See* doc. no. 23, Exhibit 9, at 10-11.

on each physical exchange line.[20]  BellSouth's Centrex ISDN service "supports simultaneous transmission of voice, data, and packet service on the same exchange access lines."[21]  BellSouth's ISDN-Business Service provides one or two B-channels and one D-channel on each physical exchange line.[22]

Since 1997 BellSouth has assessed service users of the Primary Rate ISDN service five E911 charges per Primary Rate ISDN interface.[23]  BellSouth adopted this policy by reference of the decision of the Federal Communication Commissions ("FCC") that five service user *line charges* should be assessed on a Primary Rate ISDN service user, no matter how many channels the service user used, or how many telephone numbers the service user requisitioned on each physical exchange line.[24]  For purposes of the Act's provision that "[n]o service charge shall be imposed upon more than 100 exchange access facilities per person, per location," BellSouth bills a maximum of 20 Primary Rate ISDN interfaces per service user, per location.[25]

---

[20] *See* doc. no. 25, Statement of Undisputed Facts, ¶¶ 25, 28, 51 and Exhibit O, at 1.

[21] *Id.*, Exhibit R, at 1 and Statement of Undisputed Facts, ¶¶ 36-40.

[22] *Id.*, Statement of Undisputed Facts, ¶¶ 44-48.

[23] *Id.*, Statement of Undisputed Facts, ¶¶ 22-23.

[24] *See* doc. no. 23, Statement of Undisputed Facts, ¶¶ 6-7 and Exhibit 4 (Expert report of Dr. Carl Danner, ¶¶ 38-39) (citing FCC, First Report and Order, CC Docket No. 96-262, released May 16, 1997).

[25] *See* doc. no. 25, Statement of Undisputed Facts, ¶ 21.

Primary Rate ISDN is the only service in Alabama for which BellSouth applies the five E911 charges per interface methodology.[26]  On its Channelized Trunks and Centrex ISDN services, BellSouth applies the E911 charge for each network access register ("NAR").[27]  One of BellSouth's Federal Rule of Civil Procedure 30(b)(6) representatives, Bruce Benizer, testified that "a NAR is the equivalent of a telephone line, but we really don't need wires.  It's just a software configuration that allows [a service user] an individual talk path."[28]

In a sixteen-count amended complaint, MCCD alleges that a justiciable controversy exists between MCCD and BellSouth concerning the legal requirements under the Act for collection and remittance of the E911 charge.[29]  MCCD seeks a judgment declaring that the Act requires BellSouth to collect and remit to MCCD one emergency telephone service charge for each voice telephone line or pathway capable of local exchange service, subject to the statutory limitation of 100 charges per person per location.[30]  Alternatively, MCCD seeks a judgment declaring that the Act requires BellSouth to collect and remit to MCCD the emergency telephone service charge for

---

[26] *See* doc. no. 25, Statement of Undisputed Facts, ¶ 23.

[27] *Id.*, Statement of Undisputed Facts, ¶ 31, 40.

[28] *Id.*, Exhibit H (Deposition of Bruce Benizer), at 83.

[29] *See* doc. no. 18 (Amended complaint).

[30] *Id.*, ¶ 74.

each 10-digit access number assigned to the service user.[31]

MCCD also alleges claims of breach of fiduciary duty, misrepresentation, suppression, negligence, wantonness, and breach of contract arising from BellSouth's alleged failure to collect and remit to MCCD the E911 charge in accordance with the Act.[32]  MCCD asserts that BellSouth had a statutory and common law duty to collect and remit to MCCD the emergency telephone service charges to support MCCD.[33] MCCD also seeks an accounting of BellSouth's records regarding the E911 charge.[34] Finally, MCCD requests that the court permanently enjoin BellSouth from failing to collect and remit to MCCD one emergency telephone service charge for each voice telephone line or pathway capable of local exchange service, subject to the statutory limitation of 100 charges per person per location.[35]

BellSouth has moved for summary judgment as to all of MCCD's claims.[36]  In response, MCCD concedes that its claim for breach of contract, and claims of misrepresentation and suppression as to its Primary Rate ISDN service are due to be

---

[31] *Id.*

[32] *See* doc. no. 18 (Amended complaint).

[33] *Id.*, ¶ 76.

[34] *Id.*

[35] *Id*, ¶ 105.

[36] *See* doc. no. 23.

dismissed.[37]  Judgment will be entered in favor of BellSouth on those aspects of MCCD's case without further discussion.  As outlined below, however, the court concludes that the remainder of BellSouth's motion for summary judgment should be denied.

MCCD has moved for summary judgment as to its claims for declaratory judgment, negligence, breach of fiduciary duty, and injunctive relief.[38]  As discussed below, the court concludes that MCCD's motion should be granted in part and denied in part.

### III. DISCUSSION

**A.    BellSouth's Motion for Summary Judgment**

**1.    MCCD's Claim for a Declaratory Judgment**

BellSouth argues that the Act should not be interpreted to require it to collect one E911 charge on each voice pathway capable of local exchange service.  Rather, BellSouth contends that the Act requires providers of exchange telephone service to assess the E911 charge on each *physical exchange access line*, whereas providers of

---

[37] *See* doc. no. 33, at 24 ("MCCD concedes that it became aware of BellSouth's E911 billing practices as regards Primary Rate ISDN service in 2002, and thus its misrepresentation and suppression claims as to that service are time-barred.") and at 30, n. 38 ("MCCD acknowledges that it does not have substantial evidence to create a disputed question of fact as to its claim for breach of contract, and concedes BellSouth's motion on that ground.").

[38] *See* doc. no. 24.

telephone service *via* Voice over Internet Protocol ("VoIP") or similar technology are

to assess the E911 charge on each *10-digit access number* assigned to a service user.

Section 11-98-5 of the Act sets out the E911 charge and provides, in pertinent

part:

> (a)(1) The board of commissioners of the district may, when so authorized by a vote of a majority of the persons voting within the district, in accordance with law, levy an emergency telephone service charge in an amount not to exceed five percent of the maximum tariff rate charged by any service supplier in the district, . . . . Any service charge shall have uniform application and shall be imposed throughout the entire district, to the greatest extent possible, in conformity with availability of such service in any area of the district. . . .

>     . . .

> (b) If the proceeds generated by an emergency telephone service charge exceed the amount of moneys necessary to fund the district, the board of commissioners shall, by ordinance or resolution, as provided in this chapter, reduce the service charge rate to an amount adequate to fund the district.  In lieu of reducing the service charge rate, the board of commissioners may suspend the service charge, if the revenues generated therefrom exceed the district's needs.  The board of commissioners may, by resolution or ordinance, reestablish the original emergency telephone service charge rate, or lift the suspension thereof, if the amount of moneys generated is not adequate to fund the district.

> (c) An emergency telephone service charge shall be imposed only upon the amount received from the tariff rate for exchange access lines. . . . No service charge shall be imposed upon more than 100 exchange access facilities per person, per location.  Every billed service user shall be liable for any service charge imposed under this subsection until it has been paid to the service supplier.  The duty of the service supplier to collect the service charge shall commence upon the date of its

implementation, which shall be specified in the resolution calling the election. That emergency telephone service charge shall be added to and may be stated separately in the billing by the service supplier to the service user. . . .

Ala. Code § 11-98-5 (1975) (2002 Supp.).

The Alabama Legislature amended the Act in 2005 to add § 11-98-5.1, the pertinent part of which provides that:

> The emergency communication district fee authorized and levied in each district pursuant to Section 11-98-5 shall apply to all wired telephone service utilized within the district, including such service provided through Voice-Over-Internet Protocol (VoIP) or other similar technology. It shall be the duty of each provider of VoIP or similar service to collect the fee for each 10-digit access number assigned to the user and to remit such fee as provided in Section 11-98-5.

Ala. Code 1975 § 11-98-5.1(c).

VoIP technology enables voice telephone calls over the Internet using hardware that a service user purchased for Internet service.[39]  Before the 2005 amendment to the Act, VoIP service users did not have to pay an E911 charge, even if they were able to call 911.  Consequently, BellSouth asserts that VoIP users were able to "free ride" off the 911 system.  *See* doc. no. 23, at 15.  This problem was exacerbated by an FCC order in 2005 that required VoIP providers to connect their service users to a 911 center, provided that the service user had a 10-digit telephone number.  The

---

[39] *See* doc. no. 25, Statement of Undisputed Facts, ¶ 53.

Alabama legislature subsequently amended the Act to add § 11-98-5.1, and thereby required providers of VoIP to collect the E911 charge for each 10-digit access number assigned to a service user and to remit the charge to the appropriate communications district.[40]

BellSouth argues that the first and third sentences of § 11-98-5(c) plainly limit the E911 charge to *physical* exchange access lines and, therefore, the Act should not be interpreted to require an E911 charge on each channel (voice pathway) that flows on a physical exchange access line.  *See* § 11-98-5(c) ("An emergency telephone service charge shall be imposed *only* upon the amount received from the tariff rate for *exchange access lines*. . . . No service charge shall be imposed upon more than 100 *exchange access facilities* per person, per location." (emphasis added)).  The Act does not define the term "exchange access lines," and the term "channel" is not found anywhere in the Act, but BellSouth argues that other defined terms in the Act and BellSouth's tariffs demonstrate that an *exchange access line* is something quite different from a *channel*.  *See* § 11-98-1(4) (defining the term "exchange access facilities" as "[a]ll lines, provided by the service suppliers for local exchange service, as defined in existing general subscriber services tariffs."); § 11-98-1(10) (defining the term "uniform application" as "[t]he rate to be charged or applied by the

---

[40] *See* doc. no. 23, at 15 (citing Danner Report, ¶ 30).

communication district to the exchange access rate charged to business and residential access lines."); and doc. no. 25, Exhibit K (Primary Rate ISDN tariff) (defining "BellSouth Primary Rate ISDN Access Line" as "a four-wire access loop"). BellSouth particularly argues that a *channel* is not encompassed in the term "exchange access line" because a *channel* is not a *physical line*.  BellSouth also argues that if the Alabama Legislature had wanted to assess a surcharge on each channel, it could have.

This court follows the principles of statutory construction set out by the Alabama Supreme Court.  As that Court has explained:

> When interpreting a statute, this Court must read the statute as a whole because statutory language depends on context; we will presume that the Legislature knew the meaning of the words it used when it enacted the statute.  *Ex parte Jackson*, 614 So. 2d 405, 406-07 (Ala. 1993).  Additionally, *when a term is not defined in a statute, the commonly accepted definition of the term should be applied*.  *Republic Steel Corp. v. Horn*, 268 Ala. 279, 281, 105 So. 2d 446, 447 (1958).

*Bean Dredging, L.L.C. v. Alabama Dept. of Revenue*, 855 So. 2d 513, 517 (Ala. 2003) (emphasis added).  The Alabama Supreme Court has also held that, when terms are not defined in a statute, "'we first consider the intent and purpose of the Legislature in the enactment . . .  and then, if necessary resort to the definition as found in the dictionaries, which usually give us the common understand [*sic*] and to which our courts usually resort.'"  *State v. Advertiser Co.*, 257 Ala. 423, 428, 59 So. 2d 576, 579

(1952) (adopting and quoting the opinion of the trial court).  Accordingly, this court

must determine the commonly accepted definition of the term "exchange access *line*"

as part of the determination of how the E911 charge should be assessed.

This court's careful review of the state statutes, as well as the parties' briefs,

record evidence, and oral argument, demonstrates that the commonly accepted

definition of term "exchange access line" does not only refer to *physical lines*

between service users and the local exchange network, but rather refers to all *voice*

*pathways* capable of *accessing local exchange service*.  The report from MCCD's

expert, Philip H. Enslow, Jr., Ph.D., states:

> "Line" is a term widely used in the art.  "Line" has many
> meanings as exemplified by [BellSouth's] list of definitions; however,
> the Act[] ha[s] imparted a very specific meaning to "line" — *A line*
> *provides access to "local exchange service."*  The function or role of a
> line is quite specific; however, it is general with regard to the
> technology or actual means utilized to provide that connection to the
> local exchange. . . . sometimes the *exchange access line* might be
> provided by a multi-pair cable or by a derived channel in a time division
> or frequency division multiplexed system.  Although, "circuit" has a
> very specific definition in the field of electricity, we also see the terms
> "circuit" and "communication path"; used to describe the access line.

MCCD's Exhibit S, at 12 (emphasis original).[41]

The "Telephone Rules of the Alabama Public Service Commission" define

---

[41] The report of BellSouth's expert, Carl R. Danner, focuses on the definition of "exchange access line" in *BellSouth's* tariffs, *not* the commonly accepted definition of the term.  *See* doc. no. 23, Exhibit 9, ¶¶ 16, 17

"access lines" as:  "*A circuit* directly connecting a central office line with the customer's termination point, including all dial tone lines, basic telephone connections, key system trunks, private branch exchange trunks, pay stations and special circuits.  *Each customer on a multi-party line is an access line*."  Doc. no. 25, Exhibit CC, at 2 (emphasis added).  The Alabama Public Service Commission further defines the term "Circuit" as "A *channel* used for transmission of energy in the furnishing of telephone and other communications service" and the term "channel" as a "*path for communication* between two or more stations or telephone central offices . . . ."  *Id*. at 3 (emphasis added).

The *Communications Standard Dictionary* defines "access line" as the "part of a circuit between a user and a switching center."   Martin H. Weik, *Communications Standard Dictionary* 8 (1983).  Additionally, the book *Engineering and Operating in the Bell System*, prepared by members of the technical staff at AT&T Bell Laboratories, states that a "network access line" is "*the connection* to a local switching system for local calling and for access to the network."   The Technical Staff and the Technical Publication Department of AT&T Bell Laboratories, *Engineering and Operating in the Bell System* 39 (R.F. Rey, technical ed., 2d ed. 1983) (emphasis added).  The book further states:  "Ordinary channels (circuits) that connect customers' station equipment to a switching station are called

*lines* or *loops*." *Id*., at 86 (emphasis original).

Moreover, many state statutes concerning an E911 charge also define "access line" as encompassing any voice pathway capable of accessing a local exchange network or emergency communications district.[42]

---

[42] *See* Colorado Rev. Stat. § 40-17-102 ("'Telephone access line' means the access to the local exchange network, as defined in tariffs approved by the commission, from the premises of an end user customer of a local exchange company to the telecommunications network to effect the transfer of information."); Idaho Code Ann. § 31-4802(1) ("'Access line'" means any telephone line, trunk line, network access register, dedicated radio signal, or equivalent that provides switched telecommunications access to a consolidated emergency communications system from either a service address or a place of primary use within this state.  In the case of wireless technology, each active dedicated telephone number shall be considered a single access line."); Iowa Code § 34A.2("'Access line'" means an exchange access line that has the ability to access dial tone and reach a public safety answering point."); 807 Ky. Admin. Regs. 5:061("'Access line' means wires or channels used to connect network interface at the subscriber premises with the central office."); Mich. Comp. Laws § 484.2102(n) ("'Line' or 'access line' means the medium over which a telecommunication user connects into the local exchange."); Nev. Admin. Code §703.2502 ("'Access line'  means any connection between a customer and a carrier that provides the customer with access to telecommunication in Nevada."); N.D. Cent. Code § 57-40.6-01(10) ("'Telephone access line' means the principal access to the telephone company's switched network, including an outward dialed trunk or access register."); N.M. Stat. § 63-9D-3(c) ("'access line' means a telecommunications company's line that has the capability to reach local public safety agencies by dialing 911, but does not include a line used for the provision of interexchange services or commercial mobile radio service"); Tex. Admin. Code § 255.4 ("The terms 'local exchange access line' or 'equivalent local exchange access line' mean the physical voice grade telecommunications connection or the cable or broadband transport facilities, or any combination of these facilities, owned, controlled, or relied upon by a service provider, between an end user customer's premises and a service provider's network that, when the digits 9-1-1 are dialed, provides the end user customer access to a public safety answering point through a permissible interconnection to the dedicated 9-1-1 network."); Utah Code Ann. § 69-2-2(3) (1953) ("'Local exchange service switched access line' means the transmission facility and local switching equipment used by a wireline common carrier to connect a customer location to a carrier's local exchange switching network for providing two-way interactive voice, or voice capable, services."); Va. Code Ann. § 58.1-1730 ("'Access lines' are defined to include residence and business telephone lines and other switched (packet or circuit) lines connecting the customer premises to the public switched telephone network for the transmission of outgoing voice-grade-capable telecommunications services. Centrex, PBX or other multistation telecommunications services will incur an E-911 tax charge on every line or trunk (Network Access Registrar or PBX trunk) that allows simultaneous unrestricted outward

The Alabama Supreme Court has stressed the importance of not viewing the words of the statute in isolation, but considering them in context: "'[O]ur rules of statutory construction direct us to look at the statute as a whole to determine the meaning of certain language that is, when viewed in isolation, susceptible to multiple reasonable interpretations.'" *Ex parte Alfa Financial Corp.*, 762 So. 2d 850, 853 (Ala. 1999) (quoting *McRae v. Security Pacific Housing Services, Inc.*, 628 So. 2d 429 (Ala. 1993)).  In this action, the Alabama Legislature's express statement that the "[E911] service charge shall have uniform application" evidences its intent that the E911 charge be uniformly imposed upon all voice pathways that provide access to the local exchange network and, thus, the communications district.  Stated in another way, collection of only five E911 charges on each Primary Rate ISDN interface capable of supporting up to 23 simultaneous E911 calls, regardless of the number of B-channels a service user activates for outward voice transmission, is not uniform.

The Legislature's amendment to the Act in 2005 to impose the E911 charge on each ten-digit access number assigned to a user of VoIP or similar technology also evidences its intent for the E911 charge to be assessed on each voice pathway to the

_____

dialing to the public switched telephone network. ISDN Primary Rate Interface services will be charged five E-911 tax charges for every ISDN Primary Rate Interface network facility established by the customer. Other channelized services in which each voice-grade channel is controlled by the telecommunications provider shall be charged one tax for each line that allows simultaneous unrestricted outward dialing to the public switched telephone network.").

local exchange network.[43]

For all the foregoing reasons, BellSouth is not entitled to summary judgment as to MCCD's claim for a declaratory judgment that the Act requires BellSouth to collect and remit to MCCD one E911 charge for each voice telephone line or pathway capable of local exchange service, subject to the statutory limitation of 100 charges per person per location.

### 2. MCCD's private right of action

BellSouth next argues that the Act does not give MCCD a private right of action. This argument is without merit because the Act expressly states that communications districts, such as MCCD, "shall be political and legal subdivisions of the state, with *power to sue* and be sued in their corporate names." Ala. Code § 11-98-2 (emphasis added). The Act further anticipates that a communications district can sue telephone service suppliers, such as BellSouth, because it provides service suppliers the following affirmative defense: "Good faith compliance by the service supplier shall constitute a complete defense to any legal action or claim that may result from the service supplier's determination of nonpayment or the identification

---

[43] The court agrees with BellSouth that § 11-98-5.1 only imposes the E911 charge on each *10-digit telephone number* provided to a user of VoIP or similar technology, and that channelized service is not a similar technology to VoIP. In contrast to the channelized services at issue, which are circuit-switched technologies, VoIP is a packet-switched technology.

of service users, or both."  Ala. Code § 11-98-5(d).

### 3.       Statute of Limitations as to MCCD's claims of misrepresentation and suppression

BellSouth next argues that MCCD's claims of misrepresentation and suppression are barred by the two-year statute of limitations for fraud claims.  *See* Ala. Code. § 6-2-3.[44]  BellSouth argues that MCCD's fraud claims accrued on the date it discovered or should have discovered how BellSouth assessed and collected the E911 charge and that the record establishes that MCCD knew how it assessed the E911 charge no later than August 26, 2002.  On that date, the director of MCCD wrote BellSouth to question its E911 charge policy as to its Primary Rate ISDN service.[45]    MCCD concedes that its fraud claims as to its Primary Rate ISDN service are time-barred, but it argues that there is a genuine issue of material fact whether it discovered, or should have discovered, BellSouth's E911 billing and collection practices as to its other services — Channelized Trunks, ISDN-Business

---

[44] Section 6-2-3 of the Alabama Code provides:

> In actions seeking relief on the ground of fraud where the statute has created a bar, the claim must not be considered as having accrued until the discovery by the aggrieved party of the fact constituting the fraud, after which he must have two years within which to prosecute his action.

Ala. Code. § 6-2-3 (1975).

[45] *See* doc. no. 23, Exhibit 7 (Letter from Ernie Blair, the director of MCCD, to BellSouth stating: "It is my understanding that BellSouth collects only five (5) fees for 9-1-1 service on PRI (Primary Rate ISDN) lines each month.").

Service, and Centrex ISDN.  The court finds that there is a genuine issue of material fact as to whether MCCD's misrepresentation and suppression claims as to these services are time-barred because the director of MCCD, Ernie Blair, testified that he was not aware of BellSouth's billing practices for these services until the commencement of this action.  *See* doc. no. 33, Exhibit MM, ¶¶ 14-15.  Whether MCCD should have discovered the alleged fraud with respect to all of BellSouth's channelized services is a question of fact for a jury.  Accordingly, BellSouth is not entitled to summary judgment on MCCD's claims of misrepresentation and suppression as to Channelized Trunks, ISDN-Business Service, and Centrex ISDN.

### 4. Statute of Limitations as to MCCD's claims of negligence, wantonness, and breach of fiduciary duty

BellSouth next argues that MCCD's claims of negligence, wantonness, and breach of fiduciary duty are likewise time-barred.  BellSouth argues that the statute of limitations for these claims is two years from the date the injury occurred, and that MCCD was allegedly injured when BellSouth interpreted the Act to develop its contested *policy* for assessing the E911 charge.  *See Brooks v. Hill*, 717 So. 2d 759, 764 (Ala. 1998) ("a claim alleging breach of fiduciary duty is governed by the two-year limitations period of § 6-2-38(l), Ala. Code 1975"); and *Cunningham v. Langston, Frazer, Sweet & Freese, P.A.*, 727 So. 2d 800, 805 (Ala. 1999) ("an action

alleging negligence or wantonness must be brought within two years of the accrual of the cause of action"). BellSouth contends that MCCD's tort claims are time-barred because it interpreted the Act with respect to each of its channelized services at issue in the 1990s, more than two years before MCCD's filing of this action on August 8, 2006.

In response, MCCD argues that its claims of negligence, wantonness, and breach of fiduciary duty do not arise from BellSouth's development of its contested policy for assessment of the E911 charge, but rather from BellSouth's failure to collect and remit to MCCD the E911 charges each month in accordance with the Act. Thus, MCCD contends that each failure to collect the E911 charge and remit it to MCCD is an independently actionable violation of BellSouth's statutorily-created duty.

MCCD further argues — and the court agrees — that its claims fit within Alabama's theory of a "continuing tort." The Alabama Supreme Court has explained that a continuing tort occurs when a defendant engages in "repeated tortious conduct which has repeatedly and continuously injured a plaintiff." *Moon v. Harco Drugs, Inc.*, 435 So. 2d 218, 220 (Ala. 1983). The Court has cautioned that a continuing tort does not exist where a single act is followed by multiple consequences, but rather requires "repetitive acts or ongoing wrongdoing." *Payton v. Monsanto Co.*, 801 So.

-24-

2d 829, 835, n.2 (Ala. 2001).  Here, MCCD's claims of negligence, wantonness, and breach of fiduciary duty are based BellSouth's alleged *ongoing* failure to properly collect and remit to MCCD the E911 charge pursuant to the Act.  In its complaint, MCCD alleges that BellSouth negligently and wantonly "failed to collect and remit . . . charges to MCCD and failed to accurately account for the same to MCCD for these services" and breached its fiduciary duty "by failing to collect and remit to MCCD the amounts that BellSouth know were due to MCCD."[46]  A new statute of limitations accrues as to MCCD's tort claims each time BellSouth collects the E911 charge.

MCCD also contends that the appropriate statute of limitations for its claims for damages is five years, because Alabama Code § 6-2-35 provides a five-year limitation period for "all actions by the state or any subdivision thereof for the recovery of amounts claimed for licenses, other than business licenses defined in Section 11-51-90.1, municipal or county franchise taxes, or other taxes."  Ala. Code § 6-2-35(2) (1975).

Although MCCD is a subdivision of the state alleging claims of damages, this court finds that the five-year statute of limitations prescribed in § 6-2-35(2) does not apply to its claims, because the E911 charge is not a "tax."  This court could not find

---

[46] Doc. no. 18 (amended complaint), ¶¶ 93, 97, 80.

that the Alabama Legislature has defined the term "tax" in § 6-2-1 *et seq.*, or

anywhere else within the Alabama Code.  However, in *State v. Commercial Loan Co.,*

251 Ala. 672, 38 So. 2d 571, 573 (Ala. 1948), the Alabama Supreme Court held that

"the word tax, unless expressly defined, is inclusive of both levies for revenue

purposes and levies for regulatory purposes."  *Commercial Loan*, 251 Ala. At 675,

38 So. 2d at 573-74.  More recently, the Alabama Supreme Court expressly agreed

with the decision of the United States District Court for the Southern District of

Alabama that a lack of correlation between a fee related to a service and the cost of

that service "militates in favor of a finding that the . . . fee is a revenue-raising 'tax

under State law.'"  *Lightwave Technologies*, *LLC v. Escambia County*, 804 So. 2d

176, 180 (Ala. 2001) (quoting *Lightwave Technologies, LLC v. Escambia County*, 43

F. Supp. 2d 1311, 1314 (S.D. Ala. 1999)).   The district court in *Lightwave*

*Technologies*, further explained:

> "A tax is generally a revenue-raising measure, imposed by a
> legislative body, that allocates revenue to a general fund, and is spent for
> the benefit of the entire community.  A user fee, by contrast, is a
> payment given in return for a government provided benefit and is tied
> in some fashion to the payor's use of the service."

*Lightwave Technologies*, 43 F. Supp. 2d at 1314 (quoting *Folio v. City of Clarksburg*,

134 F.3d 1211 (4th Cir. 1998)) (internal quotation marks and citations omitted).  *See*

*also City of Tullahoma v. Bedford County*, 938 S.W.2d 408, 412 (Tenn. 1997) ("A tax

is a revenue raising measure levied for the purpose of paying the government's general debts and liabilities."); *Bolt v. City of Lansing*, 459 Mich. 152, 161, 587 N.W.2d 264, 269 (1998) ("Generally, a fee is exchanged for a service rendered or a benefit conferred, and some reasonable relationship exists between the amount of the fee and the value of the service or benefit.  A tax, on the other hand, is designed to raise revenue." (internal quotations omitted)); *Safety Net for Abused Persons v. Segura,* 692 So. 2d 1038, 1041 (La. 1997) ("[A] tax is a charge that is unrelated to or materially exceeds the special benefits conferred upon those assessed").

Because the E911 charge is based on provision of telephone service, and is used to fund a specific service (911 service), the charge is not a revenue-raising measure and, therefore, not a tax.  MCCD's claims of negligence, wantonness, and breach of fiduciary duty are subject to a two-year statute of limitations under Alabama Code § 6-2-38(l).  Accordingly, MCCD possesses a valid and timely claim for damages from August 8, 2004 (two years prior to commencement of this action) forward.

## 5. Whether BellSouth acted reasonably in interpreting the Act

BellSouth also argues that MCCD's negligence and breach of fiduciary duty claims fail because it acted reasonably, or in good faith, in interpreting the Act.  As noted above, § 11-98-5 provides the following affirmative defense:  "Good faith

compliance by the service supplier shall constitute a complete defense to any legal action or claim that may result from the service supplier's determination of nonpayment or the identification of service users, or both."  Ala. Code § 11-98-5(d). BellSouth argues that it reasonably modeled its interpretation of the Act on the FCC's approach because the Act was not clearly worded.  MCCD responds that BellSouth's application of a federal policy to the Act does not demonstrate reasonable care. MCCD further notes that an account manager for BellSouth, Ray Preston, testified that he did not "understand the correlation between how the FCC determination of five access charges on PRI applies to Alabama law that determines the number of surcharges that are collected on E911."[47]

Whether BellSouth had reasonable grounds for believing that it was collecting the E911 charge and remitting it to MCCD in accordance with the Act is a mixed question of law and fact.  *See Dybach v. Florida Department of Corrections*, 942 F.2d 1562, 1566 (11th Cir. 1991) (citing 20 C.F.R. § 790.22(c) (stating "[w]hat constitutes good faith on the part of an employer and whether [the employer] had reasonable grounds for believing that [its] act or omission was not a violation of the Fair Labor Standards Act are mixed questions of fact and law.") (bracketed alterations original); and *U.S. v. Travers*, 233 F.3d 1327, 1331 (11th Cir. 2000) ("Whether the officers

---

[47] Doc. no. 25, Exhibit LL, at 26.

acted in subjective good faith in obtaining and executing the warrant is a mixed question of fact and law.  While the ultimate conclusion of good faith is a legal one, findings of fact serve as the predicate for this conclusion.").  The court finds that the question of whether BellSouth had good-faith intentions to collect the E911 charge in accordance with the Act is an issue for resolution by a jury.  Accordingly, BellSouth is not entitled to summary judgment as to MCCD's claims of negligence and breach of fiduciary duty.

### 6. Relief

Finally, BellSouth argues that MCCD cannot recover money damages for uncollected E911 charges because MCCD is adequately funded.  This argument is based on § 11-98-5, which reads as follows:

> If the proceeds generated by an emergency telephone service charge exceed the amount of moneys necessary to fund the district, the board of commissioners shall, by ordinance or resolution, as provided in this chapter, reduce the service charge rate to an amount adequate to fund the district.  In lieu of reducing the service charge rate, the board of commissioners may suspend the service charge, if the revenues generated therefrom exceed the district's needs.  The board of commissioners may, by resolution or ordinance, reestablish the original emergency telephone service charge rate, or lift the suspension thereof, if the amount of moneys generated is not adequate to fund the district.

Ala. Code § 11-98-5(b) (1975) (2002 Supp.).

BellSouth argues its current method of collecting the E911 charge — *e.g.*, five

E911 charges on each Primary Rate ISDN interface — has been sufficient to provide "top-of-the-line" 911 service to Madison County residents.  *See* doc. no. 23, at 16. BellSouth characterizes MCCD's facility as "state-of-the-art," and notes that it has retained earnings of $4,919,798, including approximately $1,200,000 in certificates of deposit.  *See* doc. no. 23, at 16-17.  Lastly, BellSouth contends that MCCD has not only funded the 911 operations at its facility, but has also provided equipment and facility space to other agencies, such as the Madison County Fire Department and Huntsville Emergency Medial Sercices, Inc. ("HEMSI").

This court finds that BellSouth's argument that MCCD cannot recover money damages because it is adequately funded is premised on an erroneous reading of the Act.  The plain language of § 11-98-5(b) provides that the Madison County Board of Commissioners has two options if the proceeds of the E911 charge exceed the amount of moneys necessary to fund the district:  (1) reduce the *rate* of the E911 charge, or (2) suspend the E911 charge.  Both of these options are prospective cures that should be applied uniformly to all service users within the district after the district is found to be over-funded.  The Act does not release telephone service suppliers from past liability when the communications district is over-funded, or would be over-funded if it received past-due E911 charges.  Accordingly, BellSouth is not entitled to summary judgment on the ground that MCCD cannot recover money damages for

-30-

uncollected E911 charges.

**B.      MCCD's Motion for a Partial Summary Judgment**

MCCD seeks summary judgment as to its claims for declaratory judgment, negligence, breach of fiduciary duty, and injunctive relief.

### 1. MCCD's claims for declaratory judgment and injunctive relief

Based on this court's interpretation of the Act as discussed above, MCCD is entitled to a declaration that BellSouth has a duty under the Act to collect one E911 charge for each voice pathway capable of local exchange service, subject to the statutory limit of 100 charges per person, per location.  *See* § 11-98-5(c) ("No service charge shall be imposed upon more than 100 exchange access facilities per person, per location.").  Consequently, MCCD is further entitled to an injunction permanently enjoining BellSouth from failing to collect and remit to MCCD the E911 charge for each voice pathway capable of local exchange service, subject to the statutory limit of 100 charges per person, per location.

### 2. MCCD's claims of negligence

MCCD also argues that it is entitled to summary judgment on its negligence claims.  A negligence claim based upon Alabama law requires a plaintiff to prove four elements:  (1) the defendant owed plaintiff a duty; (2) defendant breached that duty; (3) plaintiff suffered a loss or injury; and (4) the defendant's breach was the

actual and proximate cause of the plaintiff's loss or injury.  *See Ford Motor Co. v. Burdeshaw*, 661 So. 2d 236, 238 (Ala. 1995).  "'It is settled that for one to maintain a negligence action the defendant must have been subject to a legal duty,'" *Thompson v. Mindis Metals, Inc.*, 692 So. 2d 805, 807 (Ala. 1997) (quoting *Morton v. Prescott*, 564 So. 2d 913, 915 (Ala. 1990)), because "where there is no duty, there can be no negligence." *City of Bessemer v. Brantley*, 258 Ala. 675, 681, 65 So. 2d 160, 165 (1953).

This court finds that MCCD has proven each of the elements of its negligence claims.  First, BellSouth was subject to a statutory duty to collect the E911 charge and remit it to MCCD.  Second, it is undisputed that BellSouth has breached that duty by failing to collect an E911 charge for each voice pathway capable of local exchange service.  Third, MCCD has suffered financial losses due to BellSouth's failure to collect and remit the E911 charge in accordance with the Act.[48]  Fourth, MCCD's financial loss is the proximate result of BellSouth's breach of its statutory duty.

Nevertheless, MCCD is not entitled to summary judgment on its negligence claims because, as discussed in Part III(A)(5) of this opinion *supra*, a genuine issue of material facts exists as whether BellSouth acted in good faith.  *See* Ala. Code § 11-98-5(d).

---

[48] *See* doc. no. 25, Exhibit HH, (Expert report of Gary Lavender), at 4.

### 3. MCCD's claims of breach of fiduciary duty

MCCD likewise argues that it is entitled to summary judgment on its breach

of fiduciary duty claims.  The definition of a "fiduciary" relationship under Alabama

law is defined as follows:

> [Such a relationship is one in which] one person occupies toward
> another such a position of adviser or counselor as reasonably to inspire
> confidence that he will act in good faith for the other's interests, or when
> one person has gained the confidence of another and purports to act or
> advise with the other's interest in mind; where trust and confidence are
> reposed by one person in another who, as a result, gains an influence or
> superiority over the other; and it appears when the circumstances make
> it certain the parties do not deal on equal terms, but, on the one side,
> there is an overmastering influence, or, on the other, weakness,
> dependence, or trust, justifiably reposed; in both an unfair advantage is
> possible.  It arises in cases in which confidence is reposed and accepted,
> or influence acquired, and in all the variety of relations in which
> dominion may be exercised by one person over another.

*Power Equipment Co., Inc. v. First Alabama Bank*, 585 So. 2d 1291, 1297-98 (Ala.

1991) (quoting *Bank of Red Bay v. King*, 482 So. 2d 274 (Ala. 1985) (in turn citing

C.J.S. *Confidential* (1967))) (bracketed alternation original).

MCCD argues that it has demonstrated that it had reposed its trust and

confidence in BellSouth to assess correctly the E911 charge to its service users

because, each month, MCCD had to trust that BellSouth correctly collected and

remitted the E911 charge in accordance with the Act.  BellSouth has submitted

monthly statements to MCCD stating that it has billed and collected the E911 charge

-33-

in accordance with the Act, and monthly checks that reflect the amount billed to BellSouth service users for the E911 charge.  *See* doc. no. 25, Exhibit G, at 51.

BellSouth vaguely replied that MCCD is not entitled to summary judgment on its claim of breach of fiduciary duty because BellSouth has no superior knowledge over MCCD with respect to its policy.  However, one party's superior knowledge over another is not a required element to finding a fiduciary relationship between the parties, but only one factor in the determination. *See Power Equipment Co., Inc.*, 585 So. 2d at 1297-98.  This court finds that MCCD has established that BellSouth breached its fiduciary duty to MCCD to collect and remit the E911 charge in accordance with the Act.

Nevertheless, MCCD is not entitled to summary judgment on its claim of breach of fiduciary duty because, as discussed in Part III(A)(5) of this opinion *supra*, a genuine issue of material facts exists as whether BellSouth acted in good faith. *See* Ala. Code § 11-98-5(d).

## IV. CONCLUSION

For all of the foregoing reasons, BellSouth's motion for summary judgment is due to be GRANTED on MCCD's claims of breach of contract and misrepresentation and suppression as to BellSouth's Primary Rate ISDN service.  BellSouth's motion is due to be DENIED on all other claims.

MCCD's motion for a partial summary judgment is due to be GRANTED as to its claims for declaratory judgment and injunctive relief.  MCCD's motion is due to be DENIED as to its negligence and breach of fiduciary duty claims.  As to BellSouth's claims of negligence and breach of fiduciary duty, the only remaining issue is whether MCCD is entitled to the good-faith affirmative defense set out in § 11-98-5(d).

An appropriate order and partial judgment consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE and ORDERED this 31st day of March, 2009.

_____
United States District Judge